## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MICHELLE D.[1],                                              Case No. 3:24-cv-205
    Plaintiff,                                           Litkovitz, M.J.

    vs.

COMMISSIONER OF                                    **ORDER**
SOCIAL SECURITY,
    Defendant.

Plaintiff Michelle D. brings this action under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying her application for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of Errors (Doc. 10) and the Commissioner's response in opposition (Doc. 11).

## I.  Procedural Background

Plaintiff protectively filed an application for DIB on January 14, 2022, alleging an onset of disability of February 25, 2021, due to anxiety, depression, attention deficit disorder (ADD), arthritis, high blood pressure, and cataracts. (Tr. 214-24; *see also* Tr. 263). The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* telephone hearing before administrative law judge (ALJ) Nicholas J. Schwalbach. Plaintiff and a vocational expert (VE) appeared and testified at a telephone hearing on July 24, 2023. (Tr. 79-102). On August 8, 2023, the ALJ issued a decision, concluding that plaintiff was not disabled. (Tr. 53-78). This decision became the final decision of the Commissioner when the Appeals Council denied review on May 22, 2024. (Tr. 1-7).

## II.  Analysis

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2023.

2. [Plaintiff] has not engaged in substantial gainful activity since February 25, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. [Plaintiff] has the following severe impairment: degenerative disc disease, chronic obstructive pulmonary disease (COPD), depression, anxiety, and alcohol abuse (20 CFR 404.1520(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with lifting and carrying fifty pounds occasionally and twenty-five pounds frequently. She was (sic) limited to no climbing of ladders, ropes, or scaffolds with frequent stooping, kneeling, crouching, and climbing of ramps and stairs. She should avoid concentrated exposure to atmospheric conditions as defined by the Selected Characteristics of Occupations (SCO). She is limited to performing simple, routine, repetitive tasks. She is limited to occasional superficial contact with coworkers and supervisors with "superficial contact" defined as being able to receive simple instructions, ask simple questions, and receive performance appraisals but as (sic) unable to engage in more complex social interactions such as persuading other people or resolving interpersonal conflicts. She is limited to no public contact. She is limited to no fast paced work or strict production quotas. She is limited to performing jobs that involve very little, if any, change in the job duties or the work routine from one day to the next. She is further limited to jobs with no ready access to alcohol such as spirits.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

---

[2] Plaintiff's past relevant work was as a bartender (Dictionary of Occupational Titles (DOT) number 312.474-010).

7. [Plaintiff] was born [in] … 1962 and was 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date. [Plaintiff] subsequently changed age category to closely approaching retirement age (20 CFR 404.1563).

8. [Plaintiff] has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569 and 404.1569a).[3]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from February 25, 2021, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 58-72).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*,

---

[3] The vocational expert testified that plaintiff would be able to perform the requirements of representative occupations such as washer (DOT number 599.687-030), hand packager (DOT number 920.587-018), and store laborer (DOT 922.687-058). The identified positions are medium, unskilled occupations with SVPs of two. The vocational expert testified there are approximately 85,000 washer jobs, 90,000 hand packager jobs, and 150,000 store laborer jobs in the national economy that an individual with the plaintiff's vocational profile and residual functional capacity would be able to perform. (Tr. 72).

4

587 U.S. 97 (2019) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance.

. . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court considers the record as

a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

Plaintiff argues that the ALJ erred by not properly evaluating the medical opinion of Roy

Vellanki, M.D., and that based on Dr. Vellanki's opinion, she satisfied Paragraph C of Listing

12.04. (Doc. 10 at PageID 897-901). Plaintiff argues the ALJ "failed to consider the totality of

the medical records" and "failed to build an accurate and logical bridge from the evidence in the

record to support his conclusions." (Doc. 10 at PageID 898, citing Tr. 69-70). Plaintiff also

argues that the ALJ's finding that plaintiff could perform medium level of exertion was not

supported by substantial evidence. (*Id.* at PageID 901-04).

The Commissioner counters that the ALJ properly evaluated the mental health treatment

provider's opinion in accordance with the applicable regulations and properly determined

plaintiff's physical RFC. (Doc. 11). The Commissioner contends that in finding plaintiff capable of medium work, the ALJ properly evaluated plaintiff's impairments and the evidence in the record and developed an RFC supported by substantial evidence. (*Id.* at PageID 910-21).

1. Listing 12.04 and Dr. Vellanki's Opinion

Plaintiff bears the burden of proving that her impairments meet or equal a listed impairment. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (the claimant bears the burden of establishing steps one through four). To meet this burden, plaintiff must put forth evidence establishing that she meets all of a Listing's criteria. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) (citing 20 C.F.R. § 416.924(a); *Hale v. Sec'y of H.H.S.*, 816 F.2d 1078, 1083 (6th Cir. 1987)). Plaintiff may also demonstrate disability by establishing that her "impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531, (1990)). Regardless, "[t]his decision must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques." *Land v. Sec'y of H.H.S.*, 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. § 404.1526(b)).

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Otherwise, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x

6

639, 641 (6th Cir. 2013). "If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any step-three evaluation of the claimant's physical impairments where the ALJ found that the claimant had the severe impairment of back pain, and the claimant had put forth evidence that could meet the applicable Listing).

Plaintiff's severe mental health impairments include depression and anxiety. (Tr. 59).

Listing 12.04 governs depressive, bipolar and related disorders, which are:

> [C]haracterized by an irritable, depressed, elevated, or expansive mood, or by a loss of interest or pleasure in all or almost all activities, causing a clinically significant decline in functioning. Symptoms and signs may include, but are not limited to, feelings of hopelessness or guilt, suicidal ideation, a clinically significant change in body weight or appetite, sleep disturbances, an increase or decrease in energy, psychomotor abnormalities, disturbed concentration, pressured speech, grandiosity, reduced impulse control, sadness, euphoria, and social withdrawal.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00B.3.a.

Listing 12.04 is met if the "requirements of both paragraphs A and B, or the requirements of both paragraphs A and C" are satisfied. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00 A.2. Paragraph A of Listing 12.04 requires medical documentation of either a depressive disorder[4] or a bipolar disorder. *Id.* at § 12.04A. At issue in this case are the paragraph C criteria, which require a "serious and persistent" mental disorder, i.e., "a medically documented history of the existence of the disorder over a period of at least 2 years" and both:

---

[4] Listing 12.04A requires the depressive disorder be shown by at least five symptoms such as depressed mood, loss of interest in activities, appetite or weight changes, sleep disturbance, slowed or agitated movement, low energy, guilt or worthlessness, difficulty concentrating, or suicidal thoughts.

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

*Id*. at § 12.04C.

The ALJ appears to have accepted that plaintiff meets the "A" criteria of Listing 12.04. (Tr. 60). After determining that plaintiff did not meet the "B" criteria, a finding that plaintiff does not dispute, the ALJ concluded the "paragraph C" criteria were not satisfied:

In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. For example, examinations consistently reflect at least fair insight and judgment with fair impulse control, indicating more than marginal adjustment (e.g. Exhibits B4F/47-48, 174; B6F/6; B7F/5; B19F/21-22). Thus, the claimant has not demonstrated the presence of the "paragraph C" criteria.

(Tr. 61, citing to Tr. 389-90, 516, 600, 609).[5]

Plaintiff contends the ALJ's finding that plaintiff does not have marginal adjustment to satisfy the "paragraph C" criteria of Listing 12.04 is not supported by substantial evidence. (Doc. 10 at PageID 900, citing to Tr. 61). Plaintiff's argument is twofold. First, she argues the evidence the ALJ cites does not support his conclusion that plaintiff had "more than marginal adjustment." (*Id*.). Second, she argues the opinion of Dr. Vellanki, her treating physician, explicitly finds plaintiff's depressive disorder meets the "C" criteria of the Listing, and the ALJ's

---

[5] The evidence shows plaintiff has a medically documented history of depressive disorder and anxiety since at least November 2019—a period of at least 2 years—raising a substantial question that she satisfies the introductory paragraphs of Listings 12.04C. (Tr. 587-94).

finding that Dr. Vellanki's opinion is not persuasive is not supported by substantial evidence.

(*Id*.).

On the question of "marginal adjustment," the introductory paragraphs to the 12.00

Mental Disorders Listings for Adults explain:

> The criterion in C2 is satisfied when the evidence shows that, despite your diminished symptoms and signs, you have achieved only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (*see* 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00G2c.

As support for his conclusion that plaintiff does not have marginal adjustment, the ALJ

cites to four examinations showing "at least fair insight and judgment with fair impulse control."

(Tr. 61, citing Tr. 389-390, 516, 600, and 609)[6]. The ALJ does not explain, and the Court cannot

discern, the connection between "fair" insight, judgment, and impulse control and plaintiff's

ability to adapt to changes in her environment or demands that are not already part of her daily

life. Having a "fair" ability to understand and recognize one's own mental health condition

(insight) and make appropriate decisions (judgment) does not readily translate into how an

individual reacts to changes or increased demands in his or her environment. Neither the ALJ

nor the State Agency psychological consultants explain this connection, if any, and the Court is

---

[6] The ALJ also cites to "B19F/21-22," a non-existent record. Exhibit B19F consists of only seven pages. *See* Tr. 848-854. Therefore, this exhibit does not provide any support for the ALJ's finding.

without the basis to meaningfully review whether the ALJ's conclusion is substantially supported

by the evidence he cites. *Reynolds*, 424 F. App'x at 416. Nor does the ALJ cite to other medical

findings in assessing the "C" criteria of Listing 12.04. As discussed below, there is other

medical evidence not considered by the ALJ that raises a substantial question as to whether

increased demands on plaintiff's relatively homebound existence (e.g., going to the doctor)

exacerbate her functioning such that Listing 12.04C is met.

In addition, the opinion of Dr. Vellanki, one of plaintiff's former treating psychiatrists,

supports a finding that plaintiff meets the Listing 12.04C criteria. Dr. Vellanki opined that as a

result of plaintiff's Major Depression, she has a residual disease process that has resulted in such

marginal adjustment that even a minimal increase in mental demands or change in the

environment would be predicted to cause decompensation. (Tr. 348). The ALJ found Dr.

Vellanki's opinion was not persuasive because it was internally inconsistent given Dr. Vellanki's

assessment of no more than moderate mental limitations and use of a checkbox form that did not

explain his findings. (Tr. 69). The ALJ also reasoned that Dr. Vellanki's opinion was not

supported by his own treatment notes, finding:

> Dr. Vellanki's opinion is not supported by or consistent with his own treatment
> notes, which reflect relatively normal findings on examination (Exhibits B4F/45-
> 48, 73-75). Despite her depressed, sad, and anxious mood with an appropriate
> affect and impaired concentration and short attention span, the remainder of Dr.
> Vellanki's examinations indicate adequate mental functioning (e.g. Exhibit
> B4F/45-48, 73-75). Speech, perception, thought processes, associations, and
> thought content were within normal limits with no delusions, suicidal thoughts, or
> aggressive thoughts (Exhibit B4F/46-47). She was cooperative (Exhibit B4F/46).
> Intelligence and memory were within normal limits, as were insights and judgement
> (Exhibit B4F/47-48). Thus, Dr. Vellanki's opinion lacks support.

(Tr. 69-70, citing Tr. 387-90, 415-17).

The ALJ must determine the persuasiveness of a medical opinion by considering five

factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of

treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[7] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 404.1520c(c)(2). The ALJ is required to "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions" in the written decision. . . ." 20 C.F.R. § 404.1520c(b)(2).

The ALJ's explanation of the persuasiveness of Dr. Vellanki's opinion does not permit meaningful review in this case. The ALJ's cites to portions of Dr. Vellanki's progress notes that on their face appear to support the ALJ's "supportability" conclusion. However, the ALJ's omission of other findings within such records, as well as the contemporaneous therapy progress notes from the Appleseed Community Mental Health Center where Dr. Vellanki practiced, raise a substantial question about plaintiff's marginal adjustment. These other findings are not fully reflected or explained in the ALJ's decision, which prevents meaningful judicial review.

Plaintiff's two-year psychiatric treatment with Dr. Vellanki at the Appleseed Community Mental Health Center began in November 2019, where plaintiff was treated for dysthymic

---

[7] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

disorder (persistent depressive disorder), major depressive disorder, panic disorder, and alcohol use disorder.  (Tr. 351).  Relevant to the alleged disability onset date of February 25, 2021, the ALJ found Dr. Vellanki's March 10, 2021 examination findings do not support his opinion because plaintiff's mental status exam showed "speech, perception, thought processes, associations, and thought content were within normal limits with no delusions, suicidal thoughts, or aggressive thoughts."  (Tr. 70, citing Tr. 387-389).  However, Dr. Vellanki's mental status exam also revealed plaintiff's "emotional state-mood" as "depressed, sadness" and "anxious" mood and her "emotional-state affect" as "[a]ppropriate to [m]ood."  (Tr. 388).  Dr. Vellanki also described plaintiff's "intellectual functioning" as consisting of a "[s]hort attention span" and "[i]mpaired concentration."  (Tr. 388).  While the "normal" findings cited by the ALJ may suggest the absence of psychotic features or severe cognitive disorganization, they do not suggest the abnormal objective findings identified by Dr. Vellanki do not support his opinion, and the ALJ fails to explain why.  Dr. Vellanki also reported during this same visit that plaintiff's "anxiety was up," she felt "awful," and she had been "feeling more anxious over the last month." (Tr. 382).  Plaintiff reported experiencing "anxiety severe the last month associated with some emesis" and "depression symptoms with feelings of sadness [and] low motivation is moderate in intensity. . . ."  (Tr. 382).  At a counseling session at the Appleseed Community Mental Health Center nine days later, plaintiff's therapist noted no significant changes in plaintiff's condition from her last visit (Tr. 393), and plaintiff reported "continued difficulties getting out of the house."  (Tr. 395).  During a session in April 2021, plaintiff's therapist reported a significant change in plaintiff's thought process/orientation (Tr. 397), and plaintiff reported her apartment did not pass inspection with the metropolitan housing authority, causing her increased anxiety. (Tr. 399).  At a therapy session in early May 2021, plaintiff's therapist again reported a

significant change in plaintiff's thought process/orientation. (Tr. 401). Plaintiff acknowledged that "she continues to isolate herself" and discussed incidents of sexual abuse during childhood. (Tr. 403).

On May 13, 2021, plaintiff's therapist reported a significant change in plaintiff's mood/affect (Tr. 397). She continued to have difficulties with memories with recent increased anxiety. (Tr. 407). Her updated treatment plan listed goals for the period of May 13, 2021 to November 13, 2021 to include reducing "symptoms of anxiety and depression including insomnia, nausea, panic, racing thoughts, tremors, feelings of hopelessness, and fatigue as evidenced by being able to take a shower, brush teeth[,] and do laundry with less anxiety" and a status of "[r]evised with [m]inor [i]mprovement." (Tr. 406-07).

The ALJ also cites to a visit with Dr. Vellanki on May 26, 2021, stating, "Despite her depressed, sad, and anxious mood with an appropriate affect and impaired concentration and short attention span, the remainder of Dr. Vellanki's examinations indicate adequate mental functioning." (Tr. 70, citing Tr. 415-17). Again, the ALJ does not explain why the normal mental status findings support a finding of adequate mental functioning in light of the other abnormal objective findings identified by Dr. Vellanki. Moreover, the balance of Dr. Vellanki's progress notes, coupled with plaintiff's therapist's observations of plaintiff's heightened anxiety, depressed mood, impaired concentration, and physical manifestations of anxiety raise a substantial question about whether plaintiff meets the marginal adjustment requirement of Listing 12.04C.

During the May 2021 visit, Dr. Vellanki reported that plaintiff's anxiety was "7 on 1-10 scale," she did not have much of an appetite, and she had a hard time falling asleep. (Tr. 409). Dr. Vellanki reported that plaintiff "is regular[ly] taking [medications] and tolerating [them]

13

well. [S]he has some memories from past [t]hat bother her and has some high anxiety with racing though[t]s at times . . . states alcohol use is "minimal" . . . no [suicidal thoughts elicited] . . . depression symptoms with [feelings] of sadness some crying spells are moderate in intensity stable the last 3 (sic) months." (*Id.*). Dr. Vellanki noted plaintiff's "emotional state-affect" was "[a]ppropriate to Mood" which he noted was "depressed, sadness" and "anxious." (Tr. 415). Dr. Vellanki again characterized plaintiff's "[i]ntellectual [f]unctioning" as having a "[s]hort attention span" and "[i]mpaired concentration." (Tr. 416).

The following week, plaintiff reported continued difficulties with anxiety. (Tr. 426). She related increased anxiety when a friend unexpectedly stopped by and when she had to go out for errands. (*Id.*).

At a counseling session on June 17, 2021, plaintiff's therapist noted no significant changes in plaintiff's condition from her last visit. (Tr. 432). Plaintiff reported she went for a ride with her friend the previous day, and her anxiety "was not too bad in this situation." (Tr. 434). She also reported "a lot of difficulty in taking care of herself." (*Id.*). At plaintiff's next therapy session on June 24, 2021, her therapist noted a significant change in behavior/functioning from her last visit. (Tr. 436). Plaintiff reported she went to the pool with friends one day that week, but had "a lot of anxiety before going" and "had to call a friend to talk her into going." (Tr. 438). The therapist further reported that plaintiff "reports a lot of anxiety simply surrounding leaving her apartment. Reports feeling like anxiety is impossible to deal with and getting in the way of trying to make changes." (*Id.*).

At her July 1, 2021 therapy session, plaintiff reported she went to the pool with friends but reported "she still had a lot of anxiety surrounding going to the event." (Tr. 442). The following week, plaintiff again reported she went to the pool with friends one day and to the

store over the weekend. However, she further reported increasing anxiety surrounding paperwork to receive medical benefits and increased anxiety surrounding having to go out and take care of errands. (Tr. 446). Two weeks later, on July 22, 2021, plaintiff reported she did not go to pool day that week and had been more depressed and isolating herself more. (Tr. 454). Plaintiff stated, "I really think I'm getting worse," and reported, "I wish something would happen to me that I didn't have to kill myself." (*Id*.). She further reported that her apartment is "a disaster" ("I have all this trash."), and she needed to focus on cleaning up her apartment. (*Id*.). She also acknowledged that she has not completed paperwork for her disability claim. (*Id*.). Her therapist noted a significant change in behavior/functioning from her last visit. (Tr. 452).

In August 2021, therapy notes revealed plaintiff was "grouchy," experienced sleep problems, and reported an altercation with a neighbor and aggressive anger triggered by anxiety. (Tr. 458). Plaintiff's therapist noted a significant change in mood/affect from her last visit (Tr. 452) with more depression and anger. (Tr. 462). Her therapist also stressed the need to come to in-person sessions or transfer to another agency. (Tr. 466).

At plaintiff's September 3, 2021 therapy session, her therapist noted a significant change in mood/affect from her last visit. (Tr. 468). Plaintiff reported having a "bad week" and "I'm tired of crying." (Tr. 470). Plaintiff declined to discuss her past traumas that date, and her therapist reminded her of the need for face to face contact for therapy. (*Id.*). Two weeks later, plaintiff reported her anxiety had been better and she "would probably be working if she didn't have the anxiety." (Tr. 474). In October she reported, "It's kind of been up and down," and she experienced personal conflicts with others. (Tr. 486). Plaintiff recalled an incident in which a friend took her to a country club when she did not want to go, and she was very anxious about it.

15

(Tr. 490). Later that month, her anxiety remained about the same, and she experienced grief in having to switch to a new psychiatrist. (Tr. 494). While her depression was better since starting therapy, her anxiety was worse. (Tr. 498). The record reflects that from August through October 2021, plaintiff's provider repeatedly emphasized the need for an in-person appointment. Plaintiff did not comply, and the provider appears to have discontinued treatment after two years for that reason, with plaintiff expressing "sadness that she was losing this therapist and (sic) was tearful at times [stating] 'I don't want to start over.'" (Tr. 498).

Although the ALJ reasonably determined that Dr. Vellanki's opinion was not supported by the absence of explanations on the checkmark form he completed, the ALJ failed to cogently explain how Dr. Vellanki's opinion is not supported by his contemporaneous treatment notes and those of plaintiff's therapist. *See* 20 C.F.R. § 404.1520c(c)(1). The ALJ's reliance on select normal findings from plaintiff's visits with Dr. Vellanki, while failing to fully acknowledge or explain Dr. Vellanki's or the Appleseed Community Mental Health Center therapist's contemporaneous observations of plaintiff's heightened anxiety, depressed mood, impaired concentration, and physical manifestations of anxiety, prevents meaningful review of the ALJ's supportability decision. The ALJ appears to have disregarded the evidence of significant anxiety, depressed mood, poor appetite, sleep problems, short attention span, impaired concentration, and intrusive memories which affect plaintiff's ability to function outside of her home. When considered in their entirety, these records reinforce, rather than contradict, Dr. Vellanki's assessment of plaintiff's mental health impairments. In light of the above, the ALJ's supportability determination, i.e., that Dr. Vellanki's examinations "reflect relatively normal findings" and "indicate adequate mental functioning" (Tr. 69), is not substantially supported by the record.

16

Likewise, the ALJ's consistency finding omits a discussion of relevant evidence that appears to be consistent with Dr. Vellanki's opinion of marginal adjustment. The ALJ points to psychiatric and therapy notes subsequent to plaintiff's treatment at the Appleseed Community Mental Health Center and "relatively normal mental status exam findings" to conclude that Dr. Vellanki's opinion is inconsistent with the other record evidence. (Tr. 70, citing Tr. 853). However, the notes of plaintiff's psychiatrist, primary care physician, and mental health therapist appear to be consistent with Dr. Vellanki's opinion in that plaintiff's depression and anxiety significantly impact her ability to leave her home.

Dr. Brent Crane, M.D., a Clinical Counselor and Psychiatry Provider, conducted an initial psychiatric assessment on November 5, 2021. At that visit, Dr. Crane diagnosed plaintiff with an anxiety disorder and major depressive disorder with appropriate affect. (Tr. 515, 516). Dr. Crane noted plaintiff reported avoiding grocery shopping unless a friend can take her, and that "she does not like being around people (sic) talking people and becomes anxious if she does." (Tr. 516). During plaintiff's next visit on July 21, 2022, Dr. Crane noted plaintiff was "taking her medication as prescribed" but she is still "very anxious about leaving the house for just about any reason," and he added the diagnosis of "agoraphobia with panic disorder." (Tr. 599). Dr. Crane assessed major depressive disorder, anxiety disorder, and agoraphobia with panic disorder. He noted plaintiff's affect was appropriate, thought content unremarkable, and her judgment and impulse control were fair. (Tr. 61, citing Tr. 600). Dr. Crane discussed plaintiff taking Hydroxyzine as needed, including for an upcoming medical appointment, because she was "very anxious about leaving the house for just about any reason." (Tr. 600). At an appointment on February 21, 2023, plaintiff reported "she has been taking medications as prescribed and tolerating them without issue, but recently has not been taking." (Tr. 700). Plaintiff reported she

was "still struggling with anxiety," her mood was "horrible," and she had been dealing with the loss of several friends who recently died. (*Id.*).

During a visit with primary care physician Dr. Thomas D. Brown, M.D., on February 10, 2023, treatment notes show that plaintiff "has a known probable lung malignancy" but that "getting to her specialist appointments in Dayton has been difficult for her" because "[s]he seldom gets out of the house because of her depression [and] agoraphobia." (Tr. 669). This notation supports plaintiff's reports that she struggles to leave her house, especially considering her expressed fear and anxiety surrounding her potential lung cancer diagnosis. (Tr. 642, 648, 652, 656, 700). Dr. Brown also observed plaintiff was "thin and depressed" and exhibited "poor eye contact." (Tr. 670).

Treatment records from plaintiff's ongoing counseling sessions reflect she consistently endorsed persistent symptoms of anxiety and depression affecting her ability to leave her house. (*See* Tr. 462, August 19, 2021 "Client reports . . . 'more depression' [and] 'I'm just a sad person. I'm sad all the time . . . 'I'm so angry'"; Tr. 638, October 19, 2022 "Client discussed ways that catastrophizing affects her greatly in her daily life, reporting that she is always assuming the worst thing is going to happen"; Tr. 640, October 31, 2022 "Client reports increase in feeling down and depressed over the past week, reporting increase in crying and just not feeling well physically (headaches, upset stomach)" and "Client discussed being used to being alone, but feeling lonely, reporting that sometimes she finds herself crying due to memories and thinking of the past"; Tr. 642, November 11, 2022 "Client discussed that things such as cleaning have been harder and she has been spending more time in bed"; Tr. 646, December 6, 2022 "Client discussed having several upcoming appointments and feeling very anxious about these appointments due to having to leave the house more often for the appointment[s]"; Tr. 650,

January 3, 2023 "Client reports that she ended up cancelling her scheduled PCP appointments due to increased anxiety" and "reports that she has had too many appointments in a short time which has had her feeling overwhelmed" and "she has not rescheduled with PCP nor has she scheduled with psychiatrist" due to anxiety; Tr. 653, January 31, 2023 "reports increased symptoms of anxiety, reporting that she has been nauseous and vomiting as well as has noticed shaking"; Tr. 764, March 14, 2023 "client discussed shame and fear related to state of her home as she discussed letting it get bad"; Tr. 767, March 28, 2023 "client discussed feeling anxious regarding upcoming appointment [related to her housing]. . . discussing issues such as it being a small, busy office that make it hard for her to manage"; Tr. 724, 773, April 25, 2023 "ongoing struggle with isolation due to social anxiety and depression, as client discussed feeling very lonely"; Tr. 776, 825, May 9, 2023 "increase in panic and anxiety attacks . . . has been experiencing them most days again . . . reports 'everything is terrifying'"; Tr. 828, May 24, 2023 "increased symptoms of depression reporting that she has been spending more time in bed lately."

While the ALJ acknowledged some of this evidence in his decision and noted that plaintiff struggles to leave the house, the Court cannot discern the basis for the ALJ's conclusion that Dr. Vellanki's opinion is not consistent with the evidence subsequent to plaintiff's treatment at the Appleseed Community Mental Health Center.

The ALJ also found Dr. Vellanki's opinion was inconsistent with plaintiff's activities of daily living, which the ALJ found demonstrated "more than marginal adjustment." (Tr. 70). The ALJ cited to evidence that plaintiff went to the pool on June 21, 2021 (Tr. 438), June 28, 2021 (Tr. 442), and July 5, 2021 (Tr. 446), went to dinner with friends on July 12, 2021 (Tr. 450), and

reported visiting her sister and taking a trip with friends during a June 7, 2023 counseling session. (Tr. 782).

The ALJ's citation to these isolated outings ignores the bulk of the record evidence discussed above indicating plaintiff rarely leaves her house and, when she does, she is dependent on others' support. (Tr. 66). For example, plaintiff's neighbor drove her to the grocery store or bought groceries for her, brought her groceries inside, helped clean her home, and took out her trash. (Tr. 93-94, 113, 289, 516). Plaintiff acknowledged Sunday outings with a friend, but this consisted solely of driving around in her friend's car for approximately twenty minutes. (Tr. 93-94, 422, 434). Other than being driven by friends to the grocery store and her appointments, the evidence of plaintiff leaving the house or engaging in activities outside of her home between February 2021 and December 2023 is limited.

In addition, while the ALJ acknowledged some of this evidence, his decision does not address whether plaintiff's dependence on a few close individuals reflects actual social capacity or whether this evidence reflects "substantial psychosocial supports" without which plaintiff would become "unable to function outside of [her] home." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00G2c.[8] It does not appear the ALJ considered the context and support plaintiff receives in

---

[8] An ALJ must consider the "psychosocial supports" a claimant receives in assessing whether she meets the Listing 12.04C criteria:

> Psychosocial supports, structured settings, and living arrangements, including assistance from your family or others, may help you by reducing the demands made on you. In addition, treatment you receive may reduce your symptoms and signs and possibly improve your functioning, or may have side effects that limit your functioning. Therefore, when we evaluate the effects of your mental disorder and rate the limitation of your areas of mental functioning, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment. This evidence may come from reports about your functioning from you or third parties who are familiar with you, and other third-party statements or information.

20 C.F.R. § Pt. 404, Subpt. P., App. 1, § 12.00D1. Examples of psychosocial supports include, among others, "help from family members or other people who monitor your daily activities and help you to function. . . . [such as] administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you

20

her activities of daily living such that those activities are inconsistent with Dr. Vellanki's opinion.

Viewed as a whole and together with the balance of the record, the ALJ's determination that Dr. Vellanki's opinion was inconsistent with the other evidence is not supported by substantial evidence.

Accordingly, the ALJ's decision must be reversed and remanded for further proceedings to properly analyze Dr. Vellanki's medical opinion pursuant to 20 C.F.R. § 404.1520c. Further, the ALJ failed to properly evaluate the Listing criteria under paragraph C and to "consider the kind and extent of [psychosocial] supports" the plaintiff receives from her neighbor and friend. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00D1. Therefore, the ALJ must evaluate whether plaintiff meets Listing 12.04 consistent with this opinion.

2. RFC Determination

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). A claimant's RFC assessment must be based on all the relevant evidence in her case file. (Id.). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)-(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

_____

are never home alone" and living alone without psychosocial support(s) but where "you have created a highly structured environment by eliminating all but minimally necessary contact with the world outside your living space." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00D1.

The ALJ is charged with the final responsibility in determining a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c).  The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence.  20 C.F.R. § 404.1545(a)(3).  The ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  The plaintiff "bears the burden of demonstrating a RFC more restrictive than that determined by the ALJ."  *Id.* (citing *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).

Plaintiff argues that the ALJ's decision finding plaintiff capable of medium work is not supported by substantial evidence as "[t]here was no documentation or opinion" supporting this conclusion.  (Doc. 10 at PageID 903).  Plaintiff points out that the ALJ found the opinions of the non-examining physicians to be not persuasive because they did not consider the most recent objective medical evidence relating to her degenerative disc disease and COPD.  (*Id.* at PageID 903, citing Tr. 68, 621, 630, 660, 662, 750, 752).  In particular, plaintiff argues that the ALJ did not consider limitations on her ability to work through the lens of her activities of daily living, her inability to leave the house, and her "limited ability to stand/walk without pain and/or shortness of breath."  (Doc. 10 at PageID 904).  Plaintiff further states, "If limited to the sedentary or light levels of exertion, Appendix 2 to Subpart P of Part 404, Rule 201.12 or 202.04 would require a finding of disabled as Plaintiff was over 50 years of age at all relevant times."  (Doc. 10 at PageID 903).

The Commissioner counters that "the ALJ recognized that Plaintiff had two severe physical impairments: degenerative disc disease and COPD . . . [and] discussed both of these

22

impairments in detail in determining Plaintiff's physical RFC." (Doc. 11 at PageID 918). The Commissioner argues that "in determining Plaintiff's physical RFC, the ALJ found Plaintiff more limited than any medical opinion in the record." (Doc. 11 at PageID 920, citing *Ortman v. Comm'r of Soc. Sec.*, No. 2:14-CV-1900, 2016 WL 2595111, at \*2 (S.D. Ohio May 5, 2016). ("[S]ignificantly, the record contains no medical opinion of greater limitations than those that the administrative law judge included in her [residual functional capacity] determination."); *Putman v. Comm'r of Soc. Sec.*, No. 2:20-cv-3895, 2021 WL 2700330, at \*5 (S.D. Ohio July 1, 2021) ("An ALJ does not commit reversible error when discounting a medical opinion or an administrative finding because the ALJ determines that a claimant is more limited than opined.") (internal citations omitted)).

In assessing plaintiff's severe degenerative disc disease, the ALJ stated:

The claimant has a history of back pain, but the record does not support symptoms as intense, persistent, or limiting as alleged. August 2020 primary care notes reflect complaints for low back pain that had been bothering her for a while (Exhibit B4F/224). The only noted treatment was Tylenol (Exhibit B4F/218). At her four-month follow-up in December 2020, she described the pain as intermittent and moderate in severity, and it was associated with numbness in the foot (Exhibit B4F/218). She was taking Naproxen "when she needs it the most" (Exhibit B4F/218). There was no further complaints or treatment for almost two years (Exhibits B1F-B19F). November 2022 primary care notes show complaints of back pain for a week after she fell (Exhibit B8F/10). She ran out of [N]aproxen a few days prior (Exhibit B8F/10). She reported pain with bending and (sic) up from a seated position (Exhibit B8F/10). She stated she had chronic foot numbness (Exhibit B8F/10). On examination, she had some tenderness to palpation (Exhibit B8F/10). Sacroiliac joint mobility was normal bilaterally, though lumbar range of motion was limited due to pain and stiffness (Exhibit B8F/10-11). Straight leg raising was negative bilaterally (Exhibit B8F/11). Motor and sensory examinations were normal in the bilateral lower extremities (Exhibit B8F/11). Her gait was slow, but she was able to walk with a mild limp favoring the right side (Exhibit B8F/11). However, she subsequently had several unremarkable six-minute walk tests with no mention of gait difficulties (e.g. Exhibits 10F/2 and 17F/31). An x-ray showed advanced degenerative disc disease at L5-S1 with some facet arthropathy but no compression deformity (Exhibit B8F/20). June 2023 primary care notes reflect that she felt somewhat better walking stooped, but she tired and had to change positions (Exhibit B18F/21). Prolonged sitting caused problems (Exhibit B18F/21). She was

23

taking Naproxen twice per day and occasionally took a third dose (Exhibit B18F/21).  Nonetheless, her minimal complaints, conservative treatment, and limited findings on examination do not support symptoms or limitations as severe as alleged.  Accordingly, the reduced range of medium work in the above residual functional capacity fully addresses the claimant's back pain and related symptoms.

(Tr. 64).

The ALJ also determined the record does not support "symptoms or limitations as severe as alleged" for plaintiff's respiratory impairments.  (Tr. 64).  Plaintiff testified that she "get[s] winded walking to the mailbox and back" (Tr. 90), a distance of approximately "20 feet" (Tr. 95).  The ALJ acknowledged plaintiff's testimony regarding her breathing and COPD diagnosis, and the effects on her ability to lift and carry, stating:

She stated she was limited to lifting a loaf of bread or a pound of hamburger.  She indicated she does not carry a bag of potatoes.  She was not taking anything for her back pain at the moment.  She was afraid to take too much medication, but she was hoping to get referred to a specialist.  The claimant also reported she was having difficulty breathing.  She indicated trouble with the smoky air outside.  She reported her COPD causes her to get winded walking to the mailbox and back, which was about twenty feet.  She also noted some dizziness with walking.  Attempting to make the bed made her exhausted.  She reported that she saw a lung specialist and had inhalers.  She reported she had to get another CT scan.  She indicated she was told her lungs will not get better, but they wanted to make sure it did not get worse.  She stated she only had about 57% of her lung use.  She occasionally smoked half a cigarette, but she had previously been smoking a lot more.  She noted that she cut back in the few months before the hearing because of her breathing issues.  In March, she was smoking twenty to thirty-nine cigarettes per day and gradually decreased.  She noted some slight improvement with decreased smoking. She concluded that she felt like she cannot do anything physically or emotionally.

(Tr. 63).  The ALJ then summarized the relevant medical records, stating:

Records indicate that respiratory troubles date to at least 2017 (e.g. Exhibit B1F/3). By December 2019, a moderate tobacco use disorder was noted (e.g. Exhibit B4F/9).  However, few complaints of respiratory symptoms are present in the record (Exhibits B1F-B19F).  In February 2022, the claimant complained of shortness of breath and coughing, along with other flu-like symptoms (Exhibit B8F/15).  She did not want to go to the office or get tested (Exhibit B8F/15).  November 2022 primary care notes show a possible contusion to the chest after a fall (Exhibit B8F/12).  Because she was a smoker, an x-ray was recommended (Exhibit B8F/12).  Her chest x-ray showed a large nodule in the right upper lobe

that could be benign or malignant, and CAT scanning was recommended for further evaluation (Exhibit B8F/18).  She also had pulmonary hyperinflation (Exhibit B8F/18).  January 2023 pulmonology notes show complaints of over a year of seeming class I-II dyspnea with frequent brown-colored phlegm productive cough, which she attributed to her one pack per day smoking habit (Exhibit B11F/27).  She acknowledged that her smoking history led to the chest x-ray and CT scan (Exhibit B11F/27).  February 2023 pulmonology notes reflect that a pulmonary function test confirmed the presence of moderate COPD, though her six-minute walk test was noncontributory (Exhibit B10F/2).  There was a significant clinical response to bronchodilators (Exhibit B15F/6).  Lung volumes revealed air trapping and hyperinflation while diffusing capacity was mildly reduced and MVV was impaired (Exhibit B15F/6).  She had an FEV1 that was 57% of predicted values before bronchodilators, which improved to 68% of predicted values with bronchodilators (Exhibit B15F/2, 5).  Her FVC levels were 73% of predicted values before bronchodilators, which improved to 87% of predicted values with treatment (Exhibit B15F/5).  She noted that she "didn't care" for the dry powder Breo, and she did not want to rinse/gargle (Exhibit B15F/2).  A PET scan showed the right upper lobe nodule with low-grade FDG activity seen which may be benign, though a low-grade malignancy cannot be excluded (Exhibit B10F/2).  She had no clear evidence for malignancy elsewhere (Exhibit B10F/2).  She also had increased FDG uptake seen in the right hilar and parabronchial nodes that may be reactive due to a recent respiratory infection (Exhibit B10F/2).  She reported that she was a heavy smoker with one and a half pack of cigarettes per day (Exhibit B10F/2).  On examination, she had decreased air exchange at the base and prolonged expiration (Exhibit B10F/3).  The lungs were clear to auscultation with normal resonance and no rales, rhonchi, or wheezes (Exhibit B10F/3).  Records reflect that getting to appointments was difficult because she did not often leave the house (Exhibit B11F/7).  March 2023 primary care notes reflect that she did not take her Advair due to anxiety about it reacting to her vocal cords (Exhibit B17F/13).  A May 2023 chest CT showed a pulmonary nodule in the right upper lobe that was unchanged from the prior PET/CT scan that was likely a granuloma or hamartoma (Exhibit B15F/9).  There was an indeterminate left lower lobe nodule favored to be benign that was not seen on the prior study (Exhibit B15F/9).  She had tree-in-bud opacities in the lungs, which were likely changes of bronchiolitis or bronchopneumonia with diffuse bronchial wall thickening consistent with bronchitis (Exhibit B15F/9).  June 2023 pulmonology notes reflect that her six-minute walk test was normal (Exhibit B17F/31).

(Tr. 64-65).  The ALJ concluded, "Her limited respiratory complaints, combined with her significant improvement with bronchodilators, does not support symptoms as intense, persistent, or limiting as alleged.  Therefore, the reduced range of medium work in the above residual

functional capacity, which includes appropriate environmental restrictions, fully addresses the claimant's COPD." (*Id.*).

The ALJ's RFC determination does not permit meaningful review in this case. The objective evidence confirming plaintiff's advanced degenerative disc disease and moderate COPD was not interpreted in functional terms by any physician. As plaintiff noted, the ALJ found the state agency physicians' opinions unpersuasive because those opinions predated plaintiff's moderate "COPD, which was demonstrated in her February 2023 pulmonary function test (Exhibits B10F/2; B15F/2, 5)" and "imaging studies [that] confirmed degenerative disc disease at L5-S1 with some facet arthropathy but no compression deformity (Exhibit B8F/20)." (Tr. 68). In addition, there was no consultative examining physician opinion in this case, and plaintiff's primary care physician and pulmonologist did not opine on the functional limitations caused by her advanced degenerative disc disease at L5-S1 or moderate COPD. To be sure, it is not necessary that an ALJ's RFC finding correspond to a particular physician's opinion. *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."). That said, the ALJ is required to "make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, No. 18-2300, 2019 WL 2418995, at *5 (6th Cir. June 10, 2019) (quoting *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)). *See also Smiley v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 592, 601 (S.D. Ohio 2013) (remanding where the ALJ's RFC was not consistent with a single medical opinion of record *and* the record as a whole "contradicted" the ALJ's RFC finding). "Given that complete absence of

medical opinion evidence, the ALJ appears to have improperly interpreted raw medical data when assessing [p]laintiff's RFC." *Angela K. P. v. Comm'r of Soc. Sec.*, No. 3:24-cv-272, 2025 WL 1564283, at *7 (S.D. Ohio June 3, 2025), *report and recommendation adopted*, 2025 WL 1827881 (S.D. Ohio July 2, 2025) (and cases cited therein). The ALJ provided no explanation of the method by which he evaluated plaintiff's pulmonary function tests and lumbar spine x-rays in the record. For example, the Court is unable to discern how plaintiff's FEV1 that was 57% of predicted values before bronchodilators and 68% of predicted values with bronchodilators (Tr. 65) translates into the ability to walk and stand for six out of eight hours per workday and lift and carry fifty pounds occasionally and twenty-five pounds frequently to perform medium work. *See* Social Security Ruling 83-10. Based on the current state of the record, the Court is unable to discern the underlying basis for the ALJ's conclusion that plaintiff retains the functional capacity for medium work and to perform the other postural functions listed in the RFC.

The Court recognizes that it is the ALJ's responsibility to formulate the RFC. *See* 20 C.F.R. § 404.1546(c). Yet, in rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at his RFC determination.

The ALJ was required to cite some substantial medical and other evidence in the record to support his findings on plaintiff's ability to perform medium work with restrictions. Because the ALJ's decision fails to include a narrative explanation describing how the raw medical data he cited supports the specific exertional limitations set forth in the ALJ's RFC finding, *see* Social Security Ruling 96-8p, the RFC finding is not supported by substantial evidence.

**III. This matter is reversed and remanded for further proceedings.**

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Therefore, this matter is reversed and remanded for further proceedings. On remand, the ALJ must reconsider whether plaintiff meets or equals Listing 12.04C; reassess the medical opinion evidence; reassess plaintiff's RFC in accordance with the Court's decision; and obtain additional medical and vocational evidence as warranted.

Plaintiff's Statement of Errors (Doc. 10) is **SUSTAINED.** The Court **REVERSES** the Commissioner's non-disability finding and **REMANDS** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g) for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Karen L. Litkovitz
United States Magistrate Judge